IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

| | |
|---|---|
| MUHAMMAD FARID,<br><br>    Plaintiff,<br><br>v.<br><br>PRIME FLIGHT AVIATION SERVICES, INC., a Texas Corporation, and SHARP DETAILS, LLC, d/b/a PRIME APPEARANCE, a Virginia Corporation,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL OF TWELVE DEMANDED** |

COMES NOW Plaintiff, Muhammad Farid, and states and alleges the following facts and causes of action against the above-named Defendants:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter. RCW 48.30.015.

2. Venue is proper in King County under RCW 4.12.020 because the Defendant does or did business there during the applicable time period.

3. Venue is also proper in King County under RCW 4.12.025 because each of the Defendants performed work in King County.

### PARTIES

4. Plaintiff Muhammad Farid is a lawful resident of King County, Washington.

5. Defendant Prime Flight Aviation Services, Inc., is a Texas corporation doing

COMPLAINT -1-

business in the State of Washington and is an "employer" under the Washington Law Against Discrimination ("WLAD"), RCW 49.60, and the Washington Minimum Wage Act ("WMWA"), RCW 49.46.

6. Defendant Sharp Details, LLC, is a Virginia company that is owned and operated by Prime Flight Aviation Services, doing business in the State of Washington as Prime Appearance, and is an "employer" under the WLAD and the WMWA.

## FACTUAL BACKGROUND

7. Plaintiff Muhammad Farid was born and raised in the Chitral District of Pakistan. Plaintiff identifies as a member of the both the Kho and Dardic ethnic or ethnolinguistic groups. Growing up, Plaintiff first learned Khowar, the language of the Kho people. He later learned other languages spoken in Pakistan, including Urdu, Punjabi, and Hindko. In the tenth grade, Plaintiff began learning English. Over time, Plaintiff became proficient in English, but retained an accent associated with the language of the Kho and Dardic ethnic or ethnolinguistic groups and the languages of Pakistan.

8. In 2015, Plaintiff emigrated from Pakistan to the United States and is currently a lawful resident of King County, Washington.

9. On or around March 8, 2019, Plaintiff was hired by Appearance Group, Inc., to work as a Station Manager at King County International Airport – Boeing Field (hereinafter "BFI"). Appearance Group was an aircraft cleaning and maintenance company headquartered in Kansas.

10. As a Station Manager, Plaintiff was responsible for managing the BFI service hub and supervising a team of staff. This team included an Assistant Station Manager, Dalton Criswell-Koch, and several other employees. In addition to supervising the team, Plaintiff's job duties included cleaning and restocking planes. Approximately 90 percent of Plaintiff's work

1  consisted of non-managerial, manual labor. Plaintiff primarily worked on planes owned by a company called NetJets.

2.  11. Throughout his first year as Station Manager, Plaintiff received positive reviews from staff and supervisors. NetJets employees also repeatedly gave feedback that BFI was one of the best service hubs because of Plaintiff's excellent work.

12. In October 2019, Plaintiff received an "excellent" performance evaluation from his supervisor, Catalin Gavrilas.

13. Throughout 2019 and early 2020, Plaintiff was selected by Appearance Group to train staff at various service hubs across the country. He was sent to San Jose, Chicago, and Las Vegas to run training programs on three separate occasions.

14. In December 2019, Appearance Group, Inc., was bought by Prime Flight Aviation Services, Inc. ("Prime Flight"). Sharp Details, LLC, is the aircraft cleaning division of Prime Flight. In acquiring Appearance Group, Sharp Details and Prime Flight became the successor companies to Appearance Group, the joint employers of Plaintiff, and began doing business as Prime Appearance.

15. Around March 2020, Prime Appearance hired a new Project Manager, Amanda Cooper. Cooper replaced Gavrilas as Plaintiff's direct supervisor and began working with Plaintiff directly in June of 2020. Cooper did not work onsite, but in Ohio.

16. From the time Cooper began working at Prime Appearance, she treated Plaintiff differently and negatively compared to other staff.

17. Cooper constantly undermined Plaintiff's authority. She gave instructions to Plaintiff's subordinates behind Plaintiff's back and would text his team members directly without communicating anything to Plaintiff. Cooper most frequently did this with the Assistant Station Manager, Criswell-Koch, who is a white man.

18. Cooper's refusal to follow the chain of command created confusion and interfered with Plaintiff's ability to manage his team.

19. Cooper also made belittling comments about Plaintiff's comprehension of the English language. Cooper asked Plaintiff what his "tricks" were for understanding things, implying he did not fully understand English. On one occasion, Plaintiff asked Cooper to repeat something. When he thanked her, she replied "no worries, I play games at home too with my kids to make them understand things," equating Plaintiff's English comprehension to that of a child.

20. Cooper told Plaintiff she did not understand his English in written emails, saying they were difficult for her to read and understand.

21. On weekly Wednesday check-in calls, Cooper would insist she could not understand Plaintiff. In contrast, Plaintiff's previous manager had never made such a complaint about Plaintiff's accent or English proficiency.

22. During this time, Criswell-Koch deficiently performed many of his assigned duties. Thus, Plaintiff often had to double check his work and expend extra time fixing his mistakes. Criswell-Koch also failed to properly complete paperwork.

23. In October 2020, performance evaluations were due. Plaintiff completed the evaluations for his team and submitted them to Cooper for review. Plaintiff gave Criswell-Koch "average" marks, providing Cooper with his reasoning for not giving an overall "excellent" mark and specifying areas that needed improvement.

24. Cooper disregarded Plaintiff's feedback and increased Criswell-Koch's marks, giving Criswell-Koch an overall mark of "excellent" and praising him for using "professional communication," going above the norm to assist with paperwork, and "understanding and using all software necessary to ensure tasks were completed proficiently."

25. Plaintiff was surprised by this evaluation because it was an inaccurate reflection of Criswell-Koch's work. Unlike Plaintiff, Cooper did not work onsite with Criswell-Koch.

26. On or around October 21, 2020, Plaintiff received his own performance evaluation from Cooper. Cooper gave Plaintiff an overall mark of "average," with several lower "satisfactory" and "decreased performance" marks. Cooper indicated that Plaintiff needed to "proofread his emails," "improve relationship building and communication skills," and improve "paperwork and working knowledge of computer software programs."

27. On October 22, 2020, Plaintiff emailed Cooper regarding his performance evaluation, saying he felt he was being treated unfairly and that "[a]fter reading your comments I feel like I wasn't doing management work, I am just a good cleaner and stocker." He addressed Cooper's less favorable feedback and outlined why her evaluation of his performance was inaccurate. Among other things, Plaintiff noted his good interpersonal communications and relationships with NetJet pilots and Cooper's incorrect assumptions about Plaintiff's working knowledge of computer software programs.

28. On October 22, 2020, Plaintiff emailed the CEO, Matt Henry, and complained that Cooper was discriminating against him because he was a non-American employee. He told them that Cooper was directing employees with text message instructions without letting him know and that he did not feel like he was a manager anymore. He stated that he felt like she was making fun of him when he talked to her and that she was not treating him fairly or acknowledging his hard work. Plaintiff said he felt the reason for this was because he is from a different culture and because English was not his first language.

29. Plaintiff also indicated that he had serious concerns about Cooper's management and explained that Cooper was constantly undermining his supervision of staff, communicating poorly, and creating significant challenges for the BFI service hub team.

30. On October 23, 2020, Plaintiff emailed Cooper again. He asked her to explain how she could give Criswell-Koch excellent marks while withholding those same marks from Plaintiff. He complained that the differential treatment was discrimination because Plaintiff was not from the United States.

31. In late October 2020, the Director of Human Resources, Tracy Corriston, informed Plaintiff that HR was investigating his discrimination complaint.

32. In early November 2020, Corriston scheduled a private phone call with Plaintiff. During this call, she asked Plaintiff to explain why and how he thought Cooper was discriminating against him. Corriston expressed doubt that there was any discrimination.

33. Around mid-November of 2020, Corriston emailed Plaintiff to inform him that they had concluded the investigation and found no evidence of discrimination.

34. After the investigation concluded, Plaintiff noticed that Cooper no longer made comments about not understanding him. However, he soon began to feel he was being retaliated against.

35. Corriston told Plaintiff that he would need more training in areas such as conflict management, handling difficult team members, problem solving, and harassment. Corriston attached a lengthy list of online trainings for Plaintiff to complete.

36. Cooper and Corriston started piling extra work on Plaintiff. In addition to the numerous online trainings, the number of emails Plaintiff received increased. Cooper would assign Plaintiff extra tasks that were time-consuming and seemed unnecessary. For example, Cooper had Plaintiff make a separate list of staff hours, even though she already had access to staff hours through Prime Appearance's UltiPro software.

37. Due to the extra assigned tasks and training and because his station was understaffed, Plaintiff had to work 50 to 60 hours per week.

38.     During the months of November 2020 to January 2021, Corriston delayed the hiring process by not responding to Plaintiff's email threads until the last minute, when she would repeat questions that had already been discussed earlier in the thread. This slowed the whole process down and created more work for Plaintiff. Plaintiff asked to have a conference call to discuss this with Corriston, but she refused. Plaintiff eventually had to intervene to hire additional staff in January 2021.

39.     In December 2020, Cooper approved Plaintiff for four days of vacation time. Cooper then failed to find coverage for Plaintiff, which was her responsibility, requiring him to work those days. Despite working those days, they were still taken out of Plaintiff's vacation balance—an error Cooper never corrected.

40.     Cooper continued to instruct Plaintiff's team directly and without his knowledge.

41.     Around late January/early February 2021, Criswell-Koch told Plaintiff that Cooper said she wanted him (Criswell-Koch) to be a manager. Prime Appearance, however, only maintained one location in Washington State, which was at BFI.

42.     In March 2021, Corriston accused Plaintiff of not checking whether his team was clocking in and out properly and told him he would be disciplined for this. Plaintiff used his cell phone to monitor whether his team was clocking in and out, ensuring they were properly paid, a point he made to Corriston. After doing so, Corriston backed off her threat of discipline.

43.     On March 18, 2021, Plaintiff forwarded Cooper and Corriston a termination proposal for an employee he supervised for, among other things, playing video games and sleeping at work. The employee had already been issued three written warnings, all of which were approved by Cooper. Cooper had advised Plaintiff to put together termination paperwork and send it to HR, but told Plaintiff that to be terminated, an employee has to repeat the same behavior three times.

MALONEY O'LAUGHLIN, PLLC
200 WEST MERCER STREET, STE. 506
SEATTLE, WA 98119
206.513.7485

44. Upon receiving the termination proposal, Corriston told Plaintiff he needed approval from a manager. When Corriston learned Plaintiff had already received Cooper's approval, she replied to Plaintiff's email, second-guessing his decision to discipline and suggesting that that the multiple warning letters were too disconnected from one another to justify a termination.

45. On March 24, 2021, after Plaintiff returned from the airport ramp, he found Corriston in the office waiting for him, along with the Division Vice President, PJ Maher. After introducing himself, Maher told Plaintiff, "We have good news for you." Maher then informed Plaintiff the "good news" was that they were terminating him.

46. Plaintiff was shocked and asked why he was being terminated. Corriston informed him it was due to "poor performance." When Plaintiff pointed out that the BFI service hub was one of the best and consistently got high reviews under his management, Corriston said there had been internal employee complaints about Plaintiff. Corriston refused to identify the substance or makers of the complaints.

47. Plaintiff had never been disciplined prior to his termination.

48. Plaintiff asked why no one had mentioned anything about complaints to him until now. Corriston angrily told Plaintiff she would not tell him anything. She said she was not there to answer his questions, she was there to terminate him.

49. Maher gave Plaintiff a termination letter, which indicated the termination was due to "poor performance" and "team conflicts," and stated a discussion about these issues had been held on March 18, 2021, which was not true.

## COUNT I – WLAD RACE/ETHNICITY DISCRIMINATION

50. Plaintiff realleges and incorporates by reference each and every averment of this Complaint as though fully set forth herein.

51. Plaintiff is a person of color and identifies as a member of the both the Kho and

1  Dardic ethnic or ethnolinguistic groups.

2      52.    Defendants discriminated against Plaintiff because of his race/ethnicity, primarily
3  related to the accent or linguistic characteristics associated with his race/ethnicity.

4      53.    Defendants held Plaintiff to higher standard in evaluating his performance
5  compared to employees outside his ethnic group.

6      54.    Defendants terminated Plaintiff's employment because of his race/ethnicity.

7      55.    As a direct and proximate cause of Defendants' actions, Plaintiff has suffered
8  damages, including lost wages and emotional distress.

### COUNT II – WLAD NATIONAL ORIGIN DISCRIMINATION

10      56.    Plaintiff realleges and incorporates by reference each and every averment of this
11  Complaint as though fully set forth herein.

12      57.    Defendants discriminated against Plaintiff because of his country of national
13  origin and the accent or linguistic characteristics associated with the Pakistani languages spoken
14  by Plaintiff.

15      58.    Defendants held Plaintiff to higher standards in evaluating his performance
16  compared to Non-Pakistani employees.

17      59.    Defendants terminated Plaintiff's employment because of his national origin.

18      60.    As a direct and proximate cause of Defendants' actions, Plaintiff has suffered
19  damages, including lost wages and emotional distress.

### COUNT III - 42 U.S.C. § 1981 RACE/ETHNICITY DISCRIMINATION

21      61.    Plaintiff realleges and incorporates by reference each and every averment of this
22  Complaint as though fully set forth herein.

23      62.    Plaintiff is a person of color and identifies as a member of the both the Kho and
24  Dardic ethnic or ethnolinguistic groups.

25

63. Defendants discriminated against Plaintiff because of his race/ethnicity, primarily related to the accent or linguistic characteristics associated with his race/ethnicity.

64. Defendants held Plaintiff to higher standards in evaluating his performance compared to their other employees outside his ethnic group.

65. Defendants terminated Plaintiff's employment because of his race/ethnicity.

66. As a direct and proximate cause of Defendants' actions, Plaintiff has suffered damages, including lost wages and emotional distress.

73. Defendants acted with malice or reckless disregard to the rights of Plaintiff, thereby entitling Plaintiff to an award of punitive damages in an amount that will punish Defendants and deter them and others from like conduct.

## COUNT IV – WLAD RETALIATION

74. Plaintiff realleges and incorporates by reference each and every averment of this Complaint as though fully set forth herein.

75. Plaintiff engaged in protected activity by complaining about race, national origin, and/or citizenship or immigration status discrimination to Defendants.

76. Defendants retaliated against Plaintiff because he engaged in this protected activity by increasing his workload; removing his hiring duties; failing to hire employees and thereby increasing his workload; undermining his supervisory authority; treating him as a manager in name only; threatening him with discipline for baseless charges; and by terminating Plaintiff from his employment.

77. As a direct and proximate cause of Defendants' actions, Plaintiff has suffered damages, including lost wages emotional distress.

## COUNT V – 42 U.S.C. § 1981 RETALIATION

78. Plaintiff realleges and incorporates by reference each and every averment of this Complaint as though fully set forth herein.

79. Plaintiff engaged in protected activity by complaining about race/ethnicity and/or citizenship/immigration status discrimination to Defendants.

80. Defendants retaliated against Plaintiff because he engaged in this protected activity by increasing his workload; removing his hiring duties; failing to hire employees and thereby increasing his workload; undermining his supervisory authority; treating him as a manager in name only; threatening him with discipline for baseless charges; and by terminating Plaintiff from his employment.

81. As a direct and proximate cause of Defendants' actions, Plaintiff has suffered damages, including lost wages and emotional distress.

82. Defendants acted with malice or reckless disregard to the rights of Plaintiff, thereby entitling Plaintiff to an award of punitive damages in an amount that will punish Defendants and deter them and others from like conduct.

## COUNT VI – WASHINGTON MINIMUM WAGE ACT

83. Plaintiff realleges and incorporates by reference each and every averment of this Complaint as though fully set forth herein.

84. At all relevant times, Defendants were "employers" under the Washington Minimum Wage Act. RCW 49.46.010.

85. Defendants violated the WMWA by failing to pay Plaintiff overtime wages of one and one-half times his regular rate for work in excess of forty (40) hours per week.

86. Approximately 90% of Plaintiff's primary duties consisted of non-managerial, manual labor. Defendants undermined Plaintiff's remaining managerial duties to such a degree that Plaintiff was a manager in name only.

87. Because Defendants willfully (volitionally) withheld Plaintiff's overtime wages, Plaintiff is entitled to recover an award of exemplary damages in an amount that is twice the amount of unpaid overtime wages unlawfully withheld. RCW 49.52.

## REQUEST FOR RELIEF

88. Plaintiff Muhammad Farid requests all damages allowable under law, including the following:

   a. Compensatory damages, including lost wages, back pay, front pay, and emotional distress damages;

   b. Exemplary or double damages for unpaid overtime compensation;

   c. Punitive damages under 42 U.S.C. § 1981;

   d. Pre- and post-judgment interest;

   e. Attorney's fees, costs, and expenses available under federal and state law;

   f. Any and all other and further relief this Court deems just and proper.

Dated this 6th day of July, 2021.

Respectfully submitted,

By: /s/ *Matt J. O'Laughlin*
Matt J. O'Laughlin, WSBA 48706
Amy K. Maloney, WSBA 55610
MALONEY O'LAUGHLIN, PLLC
200 W. Mercer Street, Ste. 506
Seattle, Washington 98119
Tel: 206.513.7485
Fax: 206.260.3231
matt@pacwestjustice.com
amy@pacwestjustice.com

ATTORNEYS FOR PLAINTIFF